The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention where the court is now sitting. God save the United States and this honorable court. May be seated. Good morning, your honors. Chief Judge Gregory, Judge Wynn, Judge Floyd. My name is Richard Rissick. I'm honored to represent the family of Calvin Witherspoon, who suffered a carbon monoxide poisoning death due to the deliberate indifference of the Columbia Housing Authority. The decision of the district court dismissing my complaint for failure to make claims under 42 USC 1983 must be reversed for two reasons. One, the district court ignored the Iqbal standard of plausibility and the litany of detailed facts that were pled and instead made its own factual and causation determinations. And two, the district court erred by requiring an allegation that the housing authority had actual knowledge of a prior poisoning or exposure had to be made in order to establish deliberate indifference. That holding is not in any 1983 jurisprudence and that is contrary to Chief Judge Gregory, your recent opinion in Dean versus McKinney, where we talked about the spectrum of liability. Well, I have a little problem with the two out of the court interpreted the phrase almost bound to happen sooner or later. How is that different likely to happen in the long run? Your honor, that's a factual determination. In 1983 cases, we look at proximate cause and especially at a pleading stage, all I have to establish is plausibility. Are these things plausibly related to the violations and deliberate indifference post? So, so those words are not magical words regardless of which one he used. Your honor, I would agree they are because the traditional analysis of causation under 1983 is still proximate cause. It's going to be up to the jury to find that connection just as they do in as we ask them to make all kinds of factual determinations that in fact, these violations were the proximate cause of the death of Calvin Witherspoon. Your honors, carbon monoxide is ultra lethal and I think that's what makes this case so incredibly unique. It is known as the silent killer. It is undetectable by humans. It is colorless. It is tasteless and your first exposure will often be your very last. No human can detect it and the only way it can be is with a carbon monoxide alarm. The first symptoms of even being exposed to carbon monoxide are like the flu, fatigue, malaise. You wouldn't know to even connect those general feelings of ill with carbon monoxide poison. And the housing authority recognized the ultra lethality of carbon monoxide in their own policy. So you bring this as a Monell claim? Yes, I do, your honor. And you contend both that the city violated official and unofficial policies. Correct, your honor. From the perspective of the district court, which went the other way, how do you say the district court erred? Your honor, the district court erred because in recognizing and in the pleading standard of deliberate indifference. And you're right, what I just heard was two direct Monell claims, one for the official policy that I was just about to get to, which was policy 8.1.c, which I think is really critical to the analysis. And in fact, your honor, was ignored entirely by the district court in their opinion. In 2017, the housing authority themselves recognized carbon monoxide as quote unquote life threatening. They passed policy 8.1.c defining life threatening conditions and said the following. The following are considered life threatening condition, missing or inoperable carbon monoxide alarms, and improper discharge or venting of carbon monoxide gases. Staggeringly, your honors, in passing that policy. So the question, first question, whether there's a constitutional violation here. Correct, your honor. And the district court basically says no. The 14th amendment right to bodily injury does not exist here. You all seem to agree, at least in so far as the indifference standard, deliberate indifference standard. But you disagree in terms of the level of proof that's necessary for it. So there's the conundrum we face first in determining what is the level of proof that's necessary for deliberate indifference. Correct, your honor. And what I would say is there isn't one standard of a level of proof for deliberate indifference. As the opinion of Dean versus McKinney talks about referencing Sacramento versus Lewis, what we are talking about is a culpability spectrum. Do you require actual knowledge? Did they require actual knowledge? They required, and I want to quote because I want to make sure that I say it correctly when you say knowledge. What is required? A state actor's actions demonstrate deliberate indifference where the evidence shows the actor subjectively recognized a substantial risk of harm and his actions were inappropriate. You know, in McKinney, we didn't require officer McKinney to previously cause a crash. We didn't have to say, officer McKinney, you get a one free crash rule because unless and until, you know, driving 83 miles an hour on a country road without your lights on and you kill someone, you can't commit a constitutional law violation. Because what this court recognized and what the Supreme Court recognized in Sacramento versus Lewis is that we have to look at factors. The big question is what brings this from negligence to deliberate indifference? Your honor, I would, first of all, with the subjective knowledge of the harm, when the housing authority says what we are dealing with is life-threatening and requires to be corrected within 24 hours because it's so life-threatening, we are dealing with something that they know is, that they know itself is ultra lethal. In other words, you're saying this risk of harm is so obvious they ought to know about it? They do know about it. They subjectively know about it because they passed this policy and even further in this policy, your honor, to show that they know about it. I understand that's a, without a doubt, that does not answer my question. You understand that, don't you? How did they know about it? Without a doubt, that's what I'm saying. By passing a policy that required tenants who lived in private properties and their homeowners, they defined a missing carbon monoxide detector and improper venting as life-threatening themselves. Now they exempted themselves from this own policy. Thus creating a risk of harm that you say is obvious. Absolutely, your honor. Because when you couple it with the other things, which is they were legally required by both the state and the city to install carbon monoxide alarms in these apartments. They did not do so. They never tested for carbon monoxide poison. So they knowingly and willfully violated the law of the state and the city. Keep in mind, your honor, this is a housing authority. This is their business. This is what they exist for. Their charter exists to provide housing. They are mandated by their charter. They are mandated by state law. They're even mandated by the lease. They promised tenants. So they say it's mere negligence though, because they weren't aware of any carbon monoxide emissions before Mr. Witherspoon's death? Your honor, if you refuse to look, you refuse to test, and it's humanly undetectable, that's exactly what makes it so dangerous. And to give them a pass because they were legally obligated to detect it. You know, an alarm does two things, your honor. First of all, it gives fair warning to the person who's in the room that, hey, you are about to be poisoned. And number two, it lets the world know that something's producing this horribly ultra lethal poison. Don't you need to show some type of prior evidence that, you know, something like this can occur? I mean, is it speculative to say, well, you didn't put the carbon monoxide poison in and therefore there's a risk of harm? Your honor, when you keep adding up each one of these elements, when you have 30-year-old furnaces in small enclosed places where people sleep, where you don't take care of them, where you don't maintain them, you don't put the alarms in place that will test and give people the opportunity to not be poisoned, when you are required by law, when you recognize that that exact harm is life-threatening, when you keep piling each one of these factors, and then further, that their unlawfulness, this wasn't a quick change in the law. This wasn't carbon monoxide alarms were required to be installed in the next day. This wasn't the battery failed in the detector. Well, let me ask you this. Are we here at the pleading stage? Yes, your honor. So there's a good bit of reliance in the briefings on the Carter case and the Dean case. My recollection is that those cases were decided at the summary judgment stage. Correct, your honor. I have not had the opportunity for discovery, and I have pled all of these detailed facts, establishing. My colleague and friend, Mr. Turner, is going to be back up here, I'm sure, or back in the trial court on summary judgment if I'm not held to this standard of proof. But I believe these facts more than establish plausibility and establish a question of fact as to whether or not the Columbia Housing Authority was deliberately indifferent. Well, even if you get the deliberate indifference to as a substitute due process right, you still have to come forth and show that this conduct is attributable to some policy or custom that provides, and that's a separate inquiry. Correct, your honor. And that's the policy that I was absolutely referring to was policy 8.1.C, where they said carbon monoxide alarms are required to be installed and maintained. Vending must be maintained. If it is not, and it is not corrected in 24 hours, that is a life-threatening condition. They passed that policy, and they made that policy applicable to private homeowners who rent to tenants who qualify under HUD guidelines, but also made a second policy choice. They exempted themselves. The custom in this case, your honor, also, too, goes back to something that is pled in great detail. The housing authority pursues an unofficial policy of neglect of its properties. That's what it does. Saxon homes, Gonzalez Gardens, Henley homes, this is what they do, and what they do is they allow these properties to get into a state of absolute disrepair as a matter of policy because the motivation for that is, is then you can apply for HOPE grants and have them demolished. Is that policy official or unofficial, your honor, and that's exactly why it was the second cause of action was an indirect Monell action. And if you look, I went through and showed you this is exactly what they do. They neglect the property, neglect the property, allow it to fall into state of repair, property gets condemned. In the meantime, they're applying and filing for HOPE grants and say, hey, we need to demolish these properties because they're so terrible. So people are living, and they know, in a state of disrepair, and it creates a further financial incentive for them not to do maintenance. Following the death of Calvin Witherspoon, your honors, 869 code violations were found by the chief, fire chief of the city of Columbia. These are not experts. These are not my hired guns. This shows you the level of decrepitness and depravity of the people who are managing these properties, that these people were living in such horribly dangerous and unsafe conditions. That can be the basis for establishing an unofficial policy. I believe it can, your honor, because what it says is, again, we're back to arguing the proximate cause. Your honor, if I don't take care of my furnaces, and I know they produce carbon monoxide, and I don't put alarms in place, and I don't maintain them, and then someone dies from carbon monoxide poisoning, I can't say I'm surprised that someone died from carbon monoxide. No, it's a natural and proximate result. That's the essence of proximate cause, especially when we ask where the burden is slight, in this case, $5 for a carbon monoxide alarm, for people who are in the business of providing housing. And I would also add, in terms of looking at factors, you know, at Dean, when we said, you could say Dean was just a car wreck case. That's what it was. But you know what? When you Here, we have a board of commissioners who manage millions of dollars who exist solely to provide housing. They deliberated over all of these decisions over the policy of 8.1c for two years prior to the death of Calvin Witherspoon. They mismanaged these properties so badly, these were actual statements. The executive director said he had no idea what the code laws. Can you imagine? Can you imagine a housing authority in the business of providing housing where the executive director says I have no idea what the code laws were? You threw me off when you said Dean was just a car wreck case. That wasn't what Dean was. I mean, it's a car wreck, but that wasn't what Dean was dealing with. It was dealing with a police officer who had been in a situation of speeding, questioning what he had to do. How's the liability attached to that? Correct. And this court found there is liability that attached to that because it was a substantive due process by 11, given the egregiousness of Officer McKinney's actions. He was driving 83 and a 55 on a curved road. He didn't have his emergency lights on. He had more than he was not responding to an exigency. He had time to deliberate and conform his conduct. He knew what he was doing was unlawful because he was not allowed and was not privileged to speed by South Carolina law. All of those things added up and by keeping his lights off, he made the danger greater to the public. Adding up all those factors, this court said in that opinion, that creates a question of fact. The opposing counsel says in his brief that in that case, the Dean case, that officer, he had a lot of prior stuff against him. I mean, it wasn't the first time it happened. That was significant in that decision. Your Honor, it wasn't that he had prior stuff. He had, in terms of his training, he knew the dangers of speeding. He knew the dangers of driving without his lights on. Here, the Columbia Housing Authority, and I see my time is up, Your Honor. You may finish your answer. Thank you, Your Honor. Here, the Columbia Housing Authority themselves, and we talk about subjective knowledge of the risk of harm. When they say this harm is life threatening, we can take them at their word. They put it in their official policy and then they take it. Thank you, Your Honor. Thank you, Mr. Rizek. Mr. Turner? May it please the court, Your Honor. Beginning with the standard of review that opposing counsel provided to the court, we of course agree with the Iqbal and Twombly standard of plausibility. I think plausibility requires more than just bold allegations. I think plausibility requires some type of level of allegation, some type of level, not evidence in the complaint, but some type of allegation that would show the court that the issues and the standards in this case, that is, did the CHA, the Columbia Housing Authority, know facts from which it could infer that a substantial risk of serious harm to Mr. Witherspoon existed as a result of carbon monoxide being emitted by its furnace? Did it have to have actual knowledge? Your Honor, there has to be some level of knowledge. Is it actual? Actual or constructed. And I want to parlay that question into the Dean case, and Your Honor is correct. The Dean case provided a plethora of facts and allegations in that case regarding prior instances with Officer McKinney, prior remedial training, prior knowledge by McKinney, as well as perhaps the Kansas County Sheriff's Office, that he posed, by his habits, by his custom of driving, posed a threat. It wasn't his customs. I wrote Dean, so I may know a little bit about it. It wasn't his customs, what he did on prior times. It was what he did that night. He was, it was not an exigency. He was driving 80 plus miles an hour, curvy road, without lights, and the risk was such that it posed a proper standard under the law to go forward. I mean, every fact in the case is not the one that's dispositive. Yes, he did have, there was a record there, but the key was what he did that night. That was what the driving force of it was, and that's your argument of distinction is. Go ahead, any others? I'd like to add on to that. That night, he had been called off of a code of response by his supervisor. That's right, that night. That's what I said, what he did that night, or what he didn't do that night. But you suggest as if it was his prior record is what was the salient facts that led to the conclusion, and that's not correct. But go ahead. Well, we're here on a motion to dismiss, which is pleadings. Tell me, we're not talking about proving up anything right now, we're just talking about words. What did he not plead that would entitle you to a motion to dismiss? He did not plead sufficient allegations of knowledge on behalf of the Columbia Housing Authority that would show or prove a substantial risk of harm, substantial risk of serious harm to Mr. Witherspoon. He did not plead that there was any type of prior notice of problems with the furnace at issue in the unit. He did not plead any prior problems with furnaces throughout the apartment complex. He did not plead any prior citation by the Columbia Fire Department or HUD, who by the way had just inspected the properties within a year, and a year and a half of the tragic event occurring. Well, what about the policy that the state and the city had about carbon monoxide detectors? They were aware of that and did nothing. Yes, that was the change in the fire code that occurred several years before this event. And the fire code is different than the International Property Maintenance Code or the building code. Well, are you saying they don't have to pay attention to all the codes? No, sir, I'm not saying that. What I'm saying is there was a change in the code, but there was no notice given by the fire department in Columbia, which by the way was directly across the street from Allen Benedict Court, that they needed to put in the fire alarms to satisfy with the code. There was inspections done. There was never any notice given. And I know what Mr. Rissick would say to that, well, it's your responsibility to know that, but this gets to the heart of it. Would that be wrong if that was the response? Does your responsibility know? That was the issue. But in a 1983 deliberate indifference case, I do think it makes a difference because there has to be a higher standard of culpability on the culpability spectrum as the Supreme Court noted in Lewis v. Sackler. And this court noted in Dean v. McKinney. So how do we get to knowledge? Is it actual knowledge? Is it constructive knowledge? I don't know, but there's no allegation of knowledge requisite to substantiate a substantial risk of harm claim. But there is an allegation of willful blindness. And when you look at the determination of whether the city had actual knowledge, the question is how can you have actual knowledge if you are willfully blinded? And basically the opposing counsel's site says, and the example says, well, you did not inspect this furnace. You did not install carbon monoxide detectors. You made no effort to knowing the risk when you have this kind of a potential hazard that can occur. And yet they knew that you would need to put in carbon monoxide detectors and others. And the question that at least in terms of allegations, we're not trying your case for you understand that now, but not arguing as to what a jury would find on one way or the other. I'm dealing with the allegations. He says it was willful blindness. And if you have willful blindness, can that not be equated to some measure of a deliberate indifference? Knowing that something could happen as Judge Anderson noted in his order, knowing that something could happen doesn't necessarily mean it is certain to happen. That is true. But if you know it could happen and you know there's something you can do to prevent it from happening and you choose to do nothing or to be blind to it, is that not sufficient to at least create the allegation that would be sufficient to at least get over that threshold of deliberate indifference? I would say not. I would say that it would require something more, some type of better knowledge. For the plaintiff's case to succeed, Your Honor, a metaphysical certainty of fact has to occur that 30-year-old furnaces are absolutely certain, almost bound to throw off carbon monoxide at some point. Is that not a discovery matter you can determine? I mean, once you get your allegations, it seems like that might be then we'd be back on a summary judgment. Yes, sir, but they don't make any allegation of any prior requisite knowledge, constructive or actual, about the furnaces at issue. Let me ask you, maybe I just read this in another case. One of my friends in court said, we read a lot of cases, so don't hold me to this, but did the city install them in some houses and not others, the carbon monoxide? So no, they just didn't do it across the board. No, sir. What happened was, in order for there to be proper HUD reimbursement for rental properties outside the Columbia Housing Authority owned properties, in other words, reimbursement to private landowners or apartment owners, that those apartments outside the CHA has to have carbon monoxide detectors. That's the 8.1.C regulation that opposing counsel is referring to. Counsel, you said that they would have to show, for example, I think you said exactly, I'll paraphrase, but it's close to it, that they could show that a 30-year-old furnace would automatically emit carbon monoxide at some point, then there would be something sufficient, correct? You said that? Yes, sir. Well, if that's the case, wouldn't you still be able to respond as you are now? We didn't actually know that. Nobody on our staff was in mechanical engineering. Couldn't you have the same response? Oh my goodness, I didn't know that. Would that be appropriate? Those are my distinctions. Why not? Why not? Stay right there. You admit that that would not be appropriate for a 30-year-old furnace. I didn't know it. Why not? Because of the metaphysical fact, in my hypothetical, that a 30-year-old furnace is certain to throw off carbon monoxide. The certainty of that hypothesis is what would imply the requisite knowledge to me to install carbon monoxide. But at this point, it would just be a pleading. It would be an allegation, right? It would just be an allegation, correct? Yes, sir. We're not at summary judgment. That's the allegation. You're saying that would be enough to get through it because then you could assume that you knew that or imply you knew that. That would be enough. The district court noted that the fact that something could occur in the future, 30-year-old furnaces can throw off carbon monoxide. Would you agree that by inspecting the furnace, you might be able to determine that a 30-year-old furnace is emitting carbon monoxide? Would you agree that an inspection might show that? It might show that. And so if the allegation is you did not inspect, why would that not be sufficient? Say willful blindness and therefore, had you inspected what you say, if you have knowledge of it, then you would know that there is a danger here. You would install those carbon monoxide detectors. First of all, there was a, I understand it was alleged to be insufficient, but there was a maintenance program at the CHA. I understand that. We're only dealing with allegations here, which we take at this point, like most favorable to the moving party, not in terms of whether there's evidence that would refute them. So we are trying to get over the allegation stage. So we will take that at face value that the allegation is you did not inspect. We did not inspect. And that is a great negligence claim, Your Honor. I do not think- Why is it not more? Negligence is one thing, but when you, if it's, yeah, you didn't inspect and maybe they would choke them or maybe they, you know, it would be an inconvenience, wouldn't smell good, but this is something that will kill you. And if you do not inspect and you just said, if they knew knowledge that it would be there at a 30-year furnace, which you could find by an inspection, the allegation is you didn't inspect. And therefore, as a result of that, there was no indication of a carbon monoxide detector or anything else in the place. We're at the allegation stage again. I bring that up because if we start out with this Iqbal Promise thing, we don't really need to go there. We got enough just to deal with 1983 to do that. But that seems to be enough. Does it not? I don't want to prejudge the case. Let's discuss it. I would ask, Your Honor, to consider the case of Oklahoma City v. Tuttle, which we cited in our brief and it's cited in the Spell v. McDaniel case. And what that case... Is that a Supreme Court case? Yes. When was that case? I believe it was in the 80s, Your Honor. All right. Go ahead. Go ahead and talk. That case as cited in the Spell v. McDaniel case indicates that when you're dealing with a facially constitutional policy, which is what we have here, a facially constitutional policy, then one single incident is sufficient enough to prove causation, the relation of the incident to the policy. When you have on its face a constitutionally compliant policy, or in this custom, then more widespread evidence, more evidence of events occurring are needed to raise to that culpability level. In other words, if you have a facially constitutional policy, then you get one death before you proceed to being liability. In other words, something has to happen before you have it. Is that what you're saying? No, sir. I disagreed with that statement as it has... Well, I only make it... Death is extreme. You say, if it's facially constitution, something has to have happened. You are saying something has to happen. In other words, a bad has to happen in the face of that, even though, as you've indicated, constitutional policy or not, an inspection would reveal potentially that the problem exists and therefore you can address it. But to not inspect, as is alleged, and I'm only dealing with allegations. Again, I'm not trying to say this is going to be the way it is, but to not inspect means you just don't want to inspect. Why would you inspect? If that's the case, what city would ever inspect? You would simply just put in a plant and you just let it go. You would never inspect it. You wouldn't think about putting a carbon monoxide detector on it or anything of that nature. If you do, then you got to address, where was the inspection suspicion or did you do questions of the carbon monoxide? But under your theory, if it's facially constitutional, then just don't inspect, don't do a thing in the world, be willfully blind. And at the end of the day, if one incident happened, it's mere negligence. Next one, you got a problem. Well, again, the issue about inspections, there were inspections, inspections by the fire department and by HUD. Again, we're dealing with allegations, aren't we? And we're dealing with it from the perspective of, we look at the allegations based upon what the plaintiff's perspective and the light there. I get it. There may be evidence going back and forth. You got that in summary judgment. You got discovery. We're dealing with allegations of depleting. Right. And in this case, there was no, there's no allegation of prior complaints. There's no allegation of prior problems with the furnace at issue or with any of the furnaces. And that's a given. And that we accept. No allegations. The problem as I'm trying to get to is essentially to go there says you have to wait until something bad goes wrong before you can bring a matter. And when that bad goes wrong, that first person didn't get recovered. It's the next one. When you don't do nothing after the first one, even though you know, there's a risk, even though the potential you put in this carbon monoxide emitting type device here, it would, it would detect it. And even though if you just inspect, you might find out you got people living in these places. And by the way, I've seen these, I should say that when I was in the Navy, seven years ago, a horrific case, just like what you're describing. Oh, you don't have a clue. This is going on. There's a reason the detectives in there, this thing shows up and you get like cold symptoms and you have no clue what's wrong with you. And the only way you can know is through that carbon monoxide detector. Am I wrong on that? I mean, when this thing, you can't really smell this stuff. You don't. And I will say that there were multiple people that lived in the unit that did not die. I don't demean the tragic. Did they get sick? They, they, some at varying different levels, multiple people before, after this incident, were they getting sick? No, sir. Cause they evacuated the property, but you say multiple people, you brought this up. I didn't ask this. I'm just asking multiple people got were in this apartment. Some got sick. I've some before this, before he died or not after the event, the event that gave rise to what do you think would have happened? Had you inspected this furniture, this furnace, you may have, those people probably wouldn't have got sick, but you wouldn't have had that either. Well, I don't know. It depends on when the furnace began emitting the gas, the odorless, the carbon monoxide. But the key being, it didn't just affect Mr. Withers in place. It affected a unit, your honor, with six apartments in the unit. Well, it affected six apartments. This one unit for which if you had inspected it, you would have known potentially it, I mean, essentially you could have had six people in every apartment die. Really? I mean, that's really the outcome of this is that everybody in those apartments could have died. They didn't. Thankfully you had only one. He's the bad incident, which tells you if you didn't do anything after his, which you did do, then you say the others could didn't bring an action. We're only dealing at the allegation stage. Again, I keep bringing that up because you guys started out with the Zeke Bond thing. And at that stage in the game, it does seem like at least, and we've only dealt with the substance to due process aspect of it. You really hadn't had a chance to get into the custom and the official policy. That's a substantial issue in the case too. As to whether there's a customer policy. It is. And the customer policy that they tip the site to in the complaint are or not facially unconstitutional, which again, I think requires a higher level of culpability and allegations at this stage regarding fault. The complaint itself, and I've mentioned this before and your honor has acknowledged it, is devoid of any type of allegation prior notice. And I don't want to get back into the whole willful neglect thing. I agree that this is a very good negligence case, which is why the state law claims were resolved. Well, Mr. Turner, at page 28 of the JA, there's an allegation made requests for repairs and maintenance, especially as to anything related to the gas furnaces and venting were not promptly and fully investigated and repaired. I mean, didn't he say that? Your honor, I read that and I think we discussed that at the hearing with Judge Anderson that that is an allegation as to generally at the apartment complex, not with regards to the furnace at issue that was in J1. That was the unit for the furnace. Not Mr. Witherspoon unit, but another unit in the total complex. And you're saying that excludes the furnace and this general complaints about problems? I think it was conceded at the hearing that there was no evidence of prior complaints about this particular. What about if you'd had a complaints about the other furnaces? Would that have been of some relevance? We've got all these different units. You got one, got a separate unit right next to it. Got a big problem. Well, you've got that here. I mean, now if you had this instance, if you've got another set of apartments over here, it happens. You're then going to be saying, well, there are no complaints about that particular furnace here. Yes, sir. And my response to that would be problems with the furnace, working on the furnace may be a whole lot different than inspecting a furnace and trying to determine if it is throwing off carbon monoxide. It goes to the quality of the complaint, the nature of the complaint, what work was done. And there was no, and again, there's no allegation in the plaintiff's complaint that there were any issues with carbon monoxide or coming from furnaces in this unit or any other unit at Columbia Housing. I'm well over my time. Thank you, Mr. Turner. Appreciate it. Thank you, y'all. Thank you, your honors. And thank you, Judge Floyd. That's exactly the allegation that I'm referring to. And again, at the pleading stage, Mr. Turner wants me to say that somehow I magically knew everything that happened with this furnace in the timeframe beforehand when pleading that exact fact, I believe covers it. Number two, he says you conceded it below. I did absolutely not. There was no concession that they didn't. All I have pled because I am at the pleading stage. I have not conducted discovery. I have not taken depositions. I can't say what they did or didn't know. What I can say is this, though, is exactly what I said and where I got that allegation from, your honor, and why it's so critical. You don't have to take my word for it. I'd like you to read from my own complaint. Columbia Police Chief Skip Holbrook and Fire Chief Aubrey Jenkins investigated following the death of Calvin Witherspoon and made the following findings. They determined it was caused by a faulty furnace that caused carbon monoxide to build up in his apartment. The furnace that caused his death was 30 years old and a buildup of debris caused a carbon monoxide vent to stop working. The investigation found no preventative maintenance was done on appliances. Maintenance reports were inadequate and incomplete. The Columbia Housing Authority had a single inspector for 2,600 housing units. Going to your point, Judge Wynn, about willful blindness, I don't know how busy one man could be to effectively inspect 2,600 units, but that's all they had, which was not enough, according to Holbrook. And lastly, this is the conclusion of the fire chief and police chief, quote, the death of Calvin Witherspoon. And by the way, your honors, there was also Derek Roper. He also died that evening. The death of Calvin Witherspoon, Jr. He died the same time as? Yes, yes, your honor. There were two deaths. Different unit? A different unit. And were there sicknesses in other? And there were five other people who went to the hospital. Did any of them have any of symptoms before? Your honor, that's your point is exactly right on. How could I go to a medical record that said I was feeling tired today? I feel like I have the flu. I feel like I'm sick. Unless they were specifically testing and looking for carbon monoxide, there is no way you would put those two things together. Lastly, and again, the conclusion of the fire chief and police chief, the death of Calvin Witherspoon, Jr. was totally preventable through regular maintenance. But this is another crucial fact. Again, preventable through regular maintenance. There was a perception and belief by many of the people who lived at Allen Benedict that if they complained, things would not be fixed. Your honor, if we're going to require actual notice, what we're doing is we are returning to an intent to harm state. We are going to premeditation. The Columbia Housing Authority says exactly what your point was, Judge Wynn. We are not going to do anything on our properties until someone dies because that one's free. No matter how horrible we can have exposed fire, we can do anything. But we can say, you know what? Until someone dies, we don't have to look. Going back to your opinion, Judge Gregory, Chief Judge Gregory, you're encouraging every municipality, even though it's legally required to have a speedometer, hear those speedometers out of your cruisers. Because you know what? You'll be able to come in court and say, I didn't know I was speeding. And because I didn't know I was speeding, there's no way I can be deliberately indifferent because I had no actual knowledge that I was speeding. Even though I saw trees going past me very fast, even the fact that I was moving through traffic, I really didn't know I was speeding. Even though I hit this person and them hundreds of miles off the road, again, I didn't know. The law is not that much of a fool. Lastly, I want you to leave with this. I'm passionate about this case. And I apologize if on an appellate level, I've exceeded some decorum in my passion. But someone needs to speak for Calvin Witherspoon. This was a man who in the ultimate tragedy and irony... ...appellate court. You're a lawyer. And I understand that. You should stick with the law. Compassion will not move this court. But let me ask you this. Yes, Your Honor. You've made these claims of official and unofficial policy on a failure to act by the Housing Authority. Correct. And to some extent, you characterize it being affirmative acts. Aren't they more appropriately characterized as omissions? No, Your Honor, because they created the conditions. When you put...and this comes back to the knowledge...the fact that a fuel-fired furnace emits carbon monoxide is a fact. As soon as you put a fuel-fired furnace in a place, it is going to create carbon monoxide. It must be vented. That's a byproduct of science as a result of fuel being burned. That's exactly what's going to happen. So they created the dangerous condition. And because they created that dangerous condition, they have an obligation to it, no defense to it. One last point, Your Honor. I see that I'm briefly over, but I would like to just close with this. The Housing Authority created the life-threatening conditions that killed Calvin Witherspoon over a period of decades. They knew those conditions were life-threatening because they said so in their own official policy. They willfully disobeyed the laws of the state of South Carolina and the city of Columbia that would have prevented his death. And now, on a pleading level, when asked to be held accountable, they are simply arguing, we get a pass because we didn't know. Well, you said something that was interesting. Not talk about passion, but talk about the facts. You allege, as you read, that upon inspection, they found that the debris was visible in the unit. And that debris would cause the vent to stop up. And the stop-up vent would cause the emission of carbon monoxide. And even their own defense has said, we did inspections. So you've shown by the plant that if you did inspections, you would have seen the debris that has been established to be there long enough. And you knew that the results of the debris being there was deadly. Your Honor, I couldn't agree with you more. And especially when you are dealing with something this lethal, the ability to correct this was slight. Go one step further. All I had to do, routinely walk through with carbon monoxide, test, any kind of maintenance. But one inspector for 2,600 units in an apartment is clearly, in a complex, is clearly insufficient. And those, again, Your Honors, were the findings of a police chief and a fire chief. Those were not allegations. Those were findings by trained professionals of the city on the ground. You're better off, unfortunately, it's a tragic case. You're better off, in fact, if he actually or she went to that unit and inspected that one. Because one is based on not enough people to get to all of them. But the evidence shows that, no, you got to that one. And if you saw it, you would see the debris. I mean, so it's the facts in terms of at this stage to say that. But anyway, I'll leave that alone. Go ahead. And last, Your Honor, it's just simply this. We cannot return to an intent to harm stand. If actual knowledge is where we are, we are subverting Sacramento v. Lewis. We're overruling Dean v. McKinney. We're turning all of 1983 law upside down. Thank you, Your Honors. Thank you, Mr. Rizek. And Mr. Turner, thank you so much for your assistance in this case and these difficult questions. We would love to come down and greet you in our normal Fourth Circuit practice. But we cannot. But know very well that we appreciate your being here and we wish you well and stay safe. Thank you. Thank you. It was an honor and privilege.
judges: Roger L. Gregory, James Andrew Wynn, Henry F. Floyd